Robert Bruce HAWLEY, Billy Wayne Mitchell, Jimmy Morgan, Plaintiffs,

v.

David C. EVANS, Commissioner, Georgia Department of Corrections and Georgia Department of Corrections, Defendants.

No. 1:88–CV–2185–CAM.

United States District Court, N.D. Georgia, Atlanta Division.

July 5, 1989.

Robert Bruce Hawley, pro se.

John C. Jones, Office of State Atty. Gen., Atlanta, Ga., for David C. Evans, Com'r, Georgia Dept. of Corrections and Georgia Dept. of Corrections.

## ORDER

MOYE, Senior District Judge.

The above-styled action is brought by three prisoners in the Georgia Corrective System who have tested positive for antibodies to the Human Immunodeficiency Virus (hereafter "HIV") which is the precursor to the Acquired Immune Deficiency Syndrome (hereafter "AIDS"). Said action is before this court on cross motions for summary judgment, the plaintiffs' motion for clarification, the plaintiffs' motion to compel discovery, the plaintiffs' motion for reconsideration of this court's order dated April 25, 1989, and the defendants' motion to transfer plaintiffs Hawley and Mitchell from the Augusta Correctional and Medical Institution. For the reasons stated below, the defendants' motion for summary judgment is GRANTED, the defendants' motion to transfer plaintiffs Hawley and Mitchell is GRANTED, the plaintiffs' motion for summary judgment is DENIED, the plaintiffs' motion for clarification is DENIED, the plaintiffs' motion to compel is DENIED

and the plaintiffs' motion for reconsideration is DENIED.[1]

## FACTS

The plaintiffs in this action are prisoners in the Georgia Prison System. All three have tested HIV positive. However, plaintiff Mitchell is in a more advanced degree of sickness. The main thrust of the plaintiffs' complaint is a prayer for injunctive relief. They are requesting adequate and up-to-date treatment from the Georgia Department of Corrections, or, in the alternative, the right to be seen by a private physician of their own selection. They are also requesting damages, alleging that the defendants have committed acts and omissions amounting to that deliberate indifference to serious medical needs constituting cruel and unusual punishment under the Eighth Amendment.

The plaintiffs are requesting a wide variety of drugs and medical treatments, many of which are experimental and have not been approved by the Food and Drug Administration (hereafter "FDA"), claiming they have the constitutional right to such treatment either through the prison medical facilities or under the care of private physicians of their own selection. The plaintiffs claim they are financially able to employ such private physicians.

One drug that the plaintiffs are requesting, which was initially denied them by the prison authorities, is Zidovudine, more commonly known as "AZT". AZT has been approved by the FDA and is the only antiviral agent that has been clearly shown to improve immune function in AIDS patients (see attachment "E"). Its availability to the plaintiffs is therefore of central importance to this law suit.

The attitude in the scientific community towards AZT is one of uncertainty. Experts disagree about who should receive the drug, at what stage patients should be treated with it, and proper doseage. This court has received materials that delineate the policies of the Center for Disease Control (hereafter "CDC"), the Georgia Department of Human Resources (hereafter "GDHR"), and the FDA (see attachments "A" through "G", the plaintiffs' motion for summary judgment, and the defendants' supplement to cross motion for summary judgment). There are two things that one can safely conclude about the literature received: 1) the policy for administering AZT and other treatment for HIV and AIDS patients changes frequently and as yet no one in the medical community is sure of what is protocol; and 2) AZT can be highly toxic to some patients and should be used conservatively, if at all.

The Georgia Department of Corrections has a uniform policy under which it currently administers AZT to patients that have *symptomatic* HIV infection and have an absolute CD4 lymphocyte count of less than 200/mm3 in the peripheral blood, and to patients with a history of cytologically confirmed pneumocystis carinii pneumonia and an absolute CD4 lymphocyte count of less than 200/mm3 in the peripheral blood. The plaintiffs have not disputed that the above is indeed the uniform policy of the Georgia Department of Corrections. At the court's request, not order, the plaintiffs were transferred to Augusta Correctional Medical Institution for testing and were offered treatment with AZT, *even though the patients had not met the state standard mentioned above.* Two of the patients refused such treatment, one accepted.

The Georgia Department of Correction's AZT policy is not significantly dissimilar to the standards of the FDA, the CDC and the GDHR. There are some differences, for instance, in the interpretation of the word "symptomatic" (compare attachments "F" and "G"). However, such differences are to be expected because, as already mentioned, what is acceptable with AZT treatment is not immutable, but rather some-

---

1. In the original complaint, plaintiff Hawley included an equal protection claim against the government. Plaintiffs failed to plead any facts, nor have they cited any law to support such a claim. The cross motions for summary judg-ment do not address the issue. Therefore this court holds that the equal protection claim has been abandoned. In any event, this court is not aware of any evidence that would support such a claim.

thing that is indeterminate and ever-changing.

## LEGAL DISCUSSION

1. The Georgia Department of Correction's medical policy for HIV patients

 To state a claim of constitutional magnitude for the denial of medical care and treatment, the plaintiffs must show that the defendants were deliberately indifferent to their serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251, 260 (1976). In light of the facts of the instant case, it can hardly be said that the Georgia Department of Corrections has been "deliberately indifferent" to the serious medical needs of the plaintiffs. Its policy for treatment of HIV positive patients is similar to that of other reputable national and local agencies. Although its policy differs in some ways from the standards of other reputable agencies, the court in this case is not empowered to delve into the particulars and intricacies of modern medicine or to make narrow distinctions on debatable interpretations of what should be acceptable in the medical community. This court's powers are not enlarged by reason of the growing public awareness of the impact of AIDS on the national community. What this court can and must decide is whether the Department of Correction's medical policy is *constitutionally* acceptable. In the judgment of this court the applicable medical policy substantially conforms to currently acceptable medical practice. Therefore the plaintiffs do not state a claim of constitutional magnitude.

 Far from their actions being "repugnant to the conscience of mankind" pursuant to the *Estelle v. Gamble* standard, the defendants have demonstrated they are willing to pursue the modern medical practice relating to the treatment of HIV patients consistent with their roles as custodians of unwilling prisoners. The medical care provided a prisoner is not required to be "perfect, the best obtainable, or even

very good." *Brown v. Beck*, 481 F.Supp. 723, 726 (S.D.Ga.1980). The Supreme Court in *Estelle v. Gamble* specifically states that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment". 429 U.S. at 105, 97 S.Ct. at 291. Clearly, negligence is not enough.[2] Negligence, without deliberately indifferent or wanton conduct, is not cruel and unusual punishment. Negligence by a prison medical officer may constitute actionable medical malpractice. 429 U.S. at 108, 97 S.Ct. at 293. However, that is not the nature of this law suit.

2. The plaintiffs' right to employ at their own expense a private physician and the plaintiffs' right to experimental drugs for the treatment of the virus

 The plaintiffs are also asserting the right to: 1) a private physician; and 2) through and by that physician (or, in the alternative, through and by the medical facilities at the Georgia Department of Corrections) experimental and novel forms of treatment of which there appears to be some evidence of remedial, or at least therapeutical, value. This court holds that the plaintiffs are not entitled, as a matter of constitutional right, to either.

 The treatment of patients in prison is "traditionally the exclusive prerogative of the state". *Ort v. Pinchback*, 786 F.2d 1105 (11th Cir.1986); *Morrison v. Washington County, Ala.*, 700 F.2d 678 (11th Cir.1983). Some states have statutes allowing prisoners to bring in private physicians. Georgia does not have such a statute—nor is Georgia constitutionally required to have such a statute. This court holds that reasonably restricting visits from private physicians is reasonably related to the legitimate concerns of institutional security. *Newman v. State of Alabama*, 559 F.2d 283 (5th Cir.1977) *modified*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) *cert. denied*, 438 U.S.

---

2. The court does not imply that the defendants might have been negligent. On the contrary, the court finds that the defendants' actions in this case have been reasonable and acceptable in light of the current state of knowledge as to the proper medication for HIV patients.

915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978) (Prison visitation regulations should be left to prison authorities, widely adapted to individual circumstances.) This does not mean that a prison may restrict access to a private physician in *all* circumstances. However, as long as Georgia's prison system is providing *adequate* medical care, the issue of whether or not to permit a prisoner to hire a private physician remains the "exclusive prerogative" of the state of Georgia. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3rd Cir.1979) (Where prison authorities prevent an inmate from receiving *recommended* treatment for serious medical needs, or deny access to a physician capable of evaluating need for *such recommended treatment,* constitutional standards have been violated.); *West v. Keve*, 571 F.2d 158 (3rd Cir. 1978).

 The same can be said for the experimental drugs the plaintiffs are requesting. As long as Georgia's prison system is abiding by reasonable medical practices, the issue of whether to permit a prisoner to be treated with experimental drugs (many of which have not been approved by the FDA) is the "exclusive prerogative" of the state of Georgia. Moreover, jail authorities have a legitimate security concern in limiting the exposure of inmates to drugs. 612 F.2d at 761. It should also be noted that a prisoner's claim of inadequate medical treatment which reflects a mere disagreement with prison authorities over proper medical treatment, which is exactly the case at hand, does not state a claim of constitutional magnitude. *Ferranti v. Moran*, 618 F.2d 888 (1st Cir.1980); *Massey v. Hutto*, 545 F.2d 45 (8th Cir.1976).

## CONCLUSION

This court holds that pursuant to Fed.R. Civ.P. 56(c) there are no genuine issues of material fact in the instant case. Therefore, as a matter of law, this court holds that the defendants' motion for summary judgment is GRANTED and the plaintiffs' motion for summary judgment is DENIED. As a result, the plaintiffs' motion for clarification, the plaintiffs' motion to compel, and the plaintiffs' motion for reconsideration are DENIED as this order has rendered said motions moot. Likewise, the defendants' motion to transfer plaintiffs Hawley and Mitchell from the Augusta Correctional and Medical Institution is GRANTED.

The clerk is directed to enter judgment against the plaintiffs and for the defendants. There is no award of costs in this action.

SO ORDERED.

## ATTACHMENT A

U.S. Department of Justice

Federal Bureau of Prisons

Washington, DC 20534

April 17, 1989

Honorable Charles A. Moye, Jr.
Chief Judge
United States District Court
Northern District of Georgia
2142 U.S. Courthouse
Atlanta, Georgia 30303

Attn: Stephen L. Cole, Law Clerk

Dear Judge Moye:

In response to your inquiries concerning monitoring, treating, and immunizing inmates who are positive for antibodies to the Human Immunodeficiency Virus (HIV), the following information is offered.

The Federal Bureau of Prisons has established a policy that requires HIV antibody positive inmates to be evaluated by a physician at least once each month. These evaluations may or may not include a determination of T-4 count. The decision to monitor T-4 counts is a clinical decision made by the attending physician. Discussions with my colleagues have revealed that T-4 counts may generally be monitored every three to six months.

AZT treatments are provided at nearly all of our institutions. The decision to initiate AZT treatment is, again, a clinical decision. All Bureau of Prison physicians must, however, adhere to the treatment indications for AZT as outlined by the Food and Drug

Administration. The FDA recommends the use of AZT:

"for the management of certain adult patients with symptomatic HIV infection (AIDS and advanced ARC) who have a history of cytologically confirmed Pneumocystis carinii pneumonia (PCP) or an absolute CD4 (T-4 helper/inducer) lymphocyte count of less than 200/mm3 in the peripheral blood."

The Centers for Disease Control has been consulted with regard to immunizing HIV antibody positive patients. The following is a summary of their recommendations.

| Immunization | Asymptomatic patient | Symptomatic patient |
|---|---|---|
| DTP | yes | yes |
| OPV | no | no |
| IPV | yes | yes |
| MMR | yes | yes |
| HbCV | yes | yes |
| Pneumococcal | yes | yes |
| Influenza | no | yes |
| Hepatitis B | yes | yes |
| PPD | yes | yes |

The Federal Bureau of Prisons strives to follow guidelines established by CDC in rendering care to inmates. The above guidelines, however, are not established within the written policies of the Bureau of Prisons. The only reference to immunization of HIV antibody positive inmates concerns pregnant females and states in the Health Services Manual:

Pursuant to current immunization guidelines and unless medically contraindicated, all sentenced female inmates of childbearing age (50 and below unless medically incapable of childbearing) should be offered and encouraged vaccination against measles, mumps, and rubella. Medical contraindications include existing pregnancy (perform pregnancy test if there is any doubt) or planned pregnancy within three months. All inmates who are to receive this live virus immunization, shall be tested for HIV antibodies prior to immunization. Those who are HIV antibody positive shall not receive the live virus immunization. Those immunized should be cautioned against becoming pregnant during the ensuing three months. Prior episodes of one or more of the three diseases does *not* constitute a contraindication.

If you have additional questions or concerns, please do not hesitate contacting me.

Sincerely,

(s) [Signature]
Kenneth P. Moritsugu, M.D., M.P.H.
Assistant Surgeon General
Medical Director

222 MMWR April 7, 1989

*ACIP: General Recommendations — Continued*

## FEBRILE ILLNESS

The decision to administer or delay vaccination because of a current or recent febrile illness depends largely on the severity of symptoms and on the etiology of the disease.

Although a moderate or severe febrile illness is reason to postpone immunizations, minor illnesses such as mild upper-respiratory infections (URI) with or without low-grade fever are not contraindications for vaccination. In persons whose compliarce with medical care cannot be assured, it is particularly important to take every opportunity to provide appropriate vaccinations.

Children with moderate or severe febrile illnesses can be vaccinated as soon as the child has recovered. This precaution to wait avoids superimposing adverse effects of the vaccine on the underlying illness or mistakenly attributing a manifestation of the underlying illness to the vaccine.

Routine physical examinations or measuring temperatures are not prerequisites for vaccinating infants and children who appear to be in good health. Asking the parent or guardian if the child is ill, postponing vaccination in those with moderate or severe febrile illnesses, and immunizing those without contraindications to vaccination are appropriate procedures in childhood immunization programs.

## VACCINATION DURING PREGNANCY

Because of a theoretical risk to the developing fetus, pregnant women or women likely to become pregnant within 3 months after vaccination should not be given live, attenuated-virus vaccines. With some of these vaccines—particularly rubella, measles, and mumps—pregnancy is a contraindication. Both yellow fever vaccine and OPV, however, can be given to pregnant women who are at substantial risk of exposure to natural infection. When a vaccine is to be given during pregnancy, waiting until the second or third trimester is a reasonable precaution to minimize concern over teratogenicity. Although there are theoretical risks, there is no evidence

**TABLE 7. Recommendations for routine immunization of HIV-infected children — United States**

| Vaccine | Known HIV infection | |
|---|---|---|
| | Asymptomatic | Symptomatic |
| DTP* | Yes | Yes |
| OPV† | No | No |
| IPV§ | Yes | Yes |
| MMR* | Yes | Yes** |
| HbCV†† | Yes | Yes |
| Pneumococcal | Yes | Yes |
| Influenza | No §§ | Yes |

*DTP = Diphtheria and Tetanus Toxoids and Pertussis Vaccine, Adsorbed. DTP may be used up to the seventh birthday.
†OPV = Poliovirus Vaccine Live Oral, Trivalent: contains poliovirus types 1, 2, and 3.
§IPV = Poliovirus Vaccine Inactivated: contains poliovirus types 1, 2, and 3.
*MMR = Measles, Mumps, and Rubella Virus Vaccine, Live.
**Should be considered.
††HbCV = Vaccine composed of Haemophilus influenzae b polysaccharide antigen conjugated to a protein carrier.
§§Not contraindicated.

ATTACHMENT B

## DECLARATION OF KENNETH P. MORITSUGU, M.D., M.P.H.

Comes now Kenneth P. Moritsugu, M.D., M.P.H. and on his oath states:

1. I am the Medical Director of the Federal Bureau of Prisons and an Assistant Surgeon General of the U.S. Public Health Service.

2. I am responsible for the development and implementation of the HIV policy for the Bureau of Prisons. This policy provides basic guidelines regarding HIV testing, treatment, and education. Policy revisions are often necessary in light of frequent developments in the care and treatment of HIV infected individuals. Moreover, the varied aspects of treatment are also undergoing continual change, which our policy reflects. Therefore, our policy does not offer the most current or exhaustive information regarding HIV testing, treatment or education.

3. Attached is a true copy of the Bureau of Prisons' Operations Memorandum, 99–88 (6100), Human Immunodeficiency Virus.*

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on March 29, 1989.

(s) Kenneth P. Moritsugu
Kenneth P. Moritsugu, M.D., M.P.H.
Medical Director
Federal Bureau of Prisons

---

ATTACHMENT C

Georgia Department of Human Resources

878 Peachtree Street, N.E.
Atlanta, Georgia 30309

April 5, 1989

The Honorable Charles A. Moye
2342 United States District Court House
75 Spring Street
Atlanta, Georgia 30303
Attention: Steve Cole

Dear Judge Moye:

Persons with Human Immunodeficiency Virus (HIV) infection vary from being completely well to very ill. The usual course is one to ten plus years of asymptomatic disease (average 8 years), during which the person tests positive for antibodies to the virus and can transmit the disease to others by sexual intercourse, blood injections or from mother to child. Eventually illness begins and when full blown AIDS (as defined by the Centers for Disease Control) is present, average life expectancy is approximately 18 months.

The infection progresses to illness with great variability. The current medical approach emphasizes early diagnosis and treatment even before symptoms appear.

In general, all persons who are HIV positive should have a baseline medical evaluation consisting of a complete history and physical examination and certain laboratory tests (see enclosed materials) including a CD4(T4) lymphocyte count. If these procedures show no evidence of illness or immune deficiency, these studies should be repeated at 6–12 month intervals. The person should be extensively counseled at this initial visit and subsequently as to the nature of his or her illness, methods of transmission to others, and the importance of a healthy life-style in preventing progression of the infection.

At the present time there is only one FDA approved drug active against the HIV virus, this is called Zidovudine or AZT (trade name Retrovir). The average monthly cost of treating with Zidovudine is $600–800 per month for the drug plus blood tests and clinical evaluation every two weeks.

At this time the official indications for administering Zidovudine are "for the management of certain adult patients with symptomatic HIV infection (AIDS and advanced ARC) who have a history of cytologically confirmed Pneumocystis carinii pneumonia (PCP) or an absolute CD4 (T4

* Editor's Note: Operations Memorandum not submitted by the Court for publication.

ATTACHMENT C—Continued

helper/inducer) lymphocyte count of less than 200/mm3 in the peripheral blood before therapy is begun."

In practice, the great majority of infectious disease specialist in Georgia are beginning Zidovudine (AZT) in any patient, symptomatic or not, whose CD4 cell count is less than 200/mm3 in the blood.

Enclosed are clinical guidelines published jointly by the Medical Association of Georgia and the Georgia Department of Human Resources that discuss the former in more detail.* Also enclosed are the FDA approved product information about Zidovudine.

Please call me if I can be of further assistance.

Sincerely,

(s) Joseph A. Wilber

Jospeh A. Wilber, M.D.

Medical Consultant

Office of Infectious Disease

AIDS Program

JAW:cga

Enclosures

* Editors Note: Clinical guidelines not submitted by the Court for publication.

4 Scannell JP, Hitchings GH: Thioguanine in deoxyribonucleic acid from tumors of 6-mercaptopurine-treated mice. *Proc Soc Exp Biol Med* 1966; 122:627–629.

5. Paterson ARP, Tidd DM: 6-thiopurines, in Sartorelli AC, Johns DG (eds). *Antineoplastic and Immunosuppressive Agents*, Part II. Berlin, Springer-Verlag, 1975, pp 384–403.

6 Burchenal JH, Ellison RR, Murphy ML, et al: Clinical studies on 6-mercaptopurine. *Ann NY Acad Sci* 1954; 60 359–368.

7. Farber S: Summary of experience with 6-mercaptopurine. *Ann NY Acad Sci* 1954; 60.412–414.

8. Fountain JR: Clinical observations of the treatment of leukemia and allied disorders with 6-mercaptopurine. *Ann NY Acad Sci* 1954; 60.439–446

9. Hyman GA, Gellhorn A, Wolff JA: The therapeutic effect of mercaptopurine in a variety of human neoplastic diseases. *Ann NY Acad Sci* 1954; 60.430–435.

10 Einhorn M, Davidsohn I: Hepatotoxicity of mercaptopurine. *JAMA* 1964; 188:802–806.

11. Schein PS, Winokur SH: Immunosuppressive and cytotoxic chemotherapy. long-term complications. *Ann Intern Med* 1975, 82.84–95.

12. Stern MH, Minow RA, Casey JH, et al: Hepatotoxicity in patients treated with adriamycin and 6-mercaptopurine for refractory leukemia. *Am J Clin Pathol* 1975; 63.758–759.

13. Blatt J, Mulvihill JJ, Ziegler JL, et al: Pregnancy outcome following cancer chemotherapy. *Am J Med* 1980; 69 828–832.

14. Nicholson HO: Cytotoxic drugs in pregnancy. *J Obstet Gynaec Brit Cwlth* 1968; 75.307–312.

15. Woods WG, Daigle AE, Hutchinson RJ, et al: Myelosuppression associated with co-trimoxazole as a prophylactic antibiotic in the maintenance phase of childhood acute lymphocytic leukemia. *J Pediatr* 1984; 105 639–644.

16. Rees CA, Lennard L, Lilleyman JS, et al: Disturbance of 6-mercaptopurine metabolism by cotrimoxazole in childhood. lymphoblastic leukaemia. *Cancer Chemother Pharmacol* 1984; 12:87–89.

17. Reimers TJ, Sluss PM. 6-mercaptopurine treatment of pregnant mice: effects on second and third generations *Science* 1978; 201.65–67.

18. Clark PA, Hsia YE, Huntsman RG: Toxic complications of treatment with 6-mercaptopurine. *Br Med J* 1960; 1.393–395.

19. Present DH, Meltzer SJ, Wolke A, et al: Short and long term toxicity to 6-mercaptopurine in the management of inflammatory bowel disease. *Gastroenterology* 1985, 88·1545.

20 Bank L, Wright JP: 6-mercaptopurine-related pancreatitis in 2 patients with inflammatory bowel disease, abstract. *Dig Dis Sci* 1984; 29.357–359.

21 Singleton JW, Law DH, Kelley Jr ML, et al: National Cooperative Crohn's Disease Study: Adverse reactions to study drugs. *Gastroenterology* 1979; 77·870–882.

22. Dreizen S, Bodey GP, Rodriguez V, et al: Cutaneous complications of cancer chemotherapy. *Postgrad Med* 1975; 58·150–158.

23. Unpublished data on file with Burroughs Wellcome Co

24. Recommendations for the Safe Handling of Parenteral Antineoplastic Drugs. NIH Publications No. 83–2321. For sale by the Superintendent of Documents, U S Government Printing Office, Washington, D.C. 20402.

25. AMA Council Report Guidelines for Handling Parenteral Antineoplastics, *JAMA*, March 15, 1985.

26 National Study Commission on Cytotoxic Exposure—Recommendations for Handling Cytotoxic Agents Available from Louis P. Jeffrey, Sc.D., Director of Pharmacy Services, Rhode Island Hospital, 593 Eddy Street, Providence, Rhode Island 02902.

27. Clinical Oncological Society of Australia: Guidelines and recommendations for safe handling of antineoplastic agents. *Med J Australia* 1983; 1:426–428.

28 Jones RB, et al: Safe handling of chemotherapeutic agents· A report from the Mount Sinai Medical Center *Ca—A Cancer Journal for Clinicians* 1983; Sept/Oct:258–263.

29. American Society of Hospital Pharmacists technical assistance bulletin on handling cytotoxic drugs in hospitals. *Am J Hosp Pharm* 1985; 42:131–137.

*Shown in Product Identification Section, page 407*

**RETROVIR® Capsules** ℞
[rĕt-rō-vĕr¹]
(Zidovudine)

**WARNING**

THERAPY WITH RETROVIR (ZIDOVUDINE) IS OFTEN ASSOCIATED WITH HEMATOLOGIC TOXICITY INCLUDING GRANULOCYTOPENIA AND SEVERE ANEMIA REQUIRING TRANSFUSIONS (SEE WARNINGS).

IN ADDITION, PATIENTS TREATED WITH ZIDOVUDINE MAY CONTINUE TO DEVELOP OPPORTUNISTIC INFECTIONS (OI'S) AND OTHER COMPLICATIONS OF THE ACQUIRED IMMUNODEFICIENCY SYNDROME (AIDS) AND AIDS RELATED COMPLEX (ARC) CAUSED BY THE HUMAN IMMUNODEFICIENCY VIRUS (HIV). THEREFORE, PATIENTS ON ZIDOVUDINE SHOULD BE UNDER CLOSE CLINICAL OBSERVATION BY PHYSICIANS EXPERIENCED IN THE TREATMENT OF PATIENTS WITH DISEASES ASSOCIATED WITH HIV. THE SAFETY AND EFFICACY OF ZIDOVUDINE HAVE BEEN ESTABLISHED ONLY FOR CERTAIN ADULT AIDS AND ADVANCED ARC PATIENTS (SEE "INDICATIONS AND USAGE").

**DESCRIPTION**

Retrovir is the brand name for zidovudine [formerly called azidothymidine (AZT)], an antiretroviral drug active against human immunodeficiency virus (HIV). Retrovir Capsules are for oral administration. Each capsule contains 100 mg of zidovudine and the inactive ingredients corn starch, magnesium stearate, microcrystalline cellulose, and sodium starch glycolate. The 100 mg empty hard gelatin capsule, printed with edible black ink, consists of gelatin, titanium dioxide, and other ingredients. The blue band around the capsule consists of gelatin, FD&C Blue No. 2 and other ingredients. The chemical name of zidovudine is 3'-azido-3'-deoxythymidine.

Zidovudine is a white to off-white, odorless, crystalline solid with a molecular weight of 267.24 daltons and the molecular formula $C_{10}H_{13}N_5O_4$

**CLINICAL PHARMACOLOGY**

Zidovudine is an inhibitor of the *in vitro* replication of some retroviruses including HIV (also known as HTLV III, LAV, or ARV). This drug is a thymidine analogue in which the 3'-hydroxyl (-OH) group is replaced by an azido (-N₃) group. Cellular thymidine kinase converts zidovudine into zidovudine monophosphate. The monophosphate is further converted into the diphosphate by cellular thymidylate kinase and to the triphosphate derivative by other cellular enzymes. Zidovudine triphosphate interferes with the HIV viral RNA dependent DNA polymerase (reverse transcriptase) and thus, inhibits viral replication. Zidovudine triphosphate also inhibits cellular α-DNA polymerase, but at concentrations 100-fold higher than those required to inhibit reverse transcriptase. *In vitro*, zidovudine triphosphate has been shown to be incorporated into growing chains of DNA by viral reverse transcriptase When incorporation by the viral enzyme occurs, the DNA chain is terminated. Studies in cell culture suggest that zidovudine incorporation by cellular α-DNA polymerase may occur, but only to a very small extent and not in all test systems. Chain termination has not been demonstrated with cellular α-DNA polymerase.

Microbiology: The relationship between *in vitro* susceptibility of HIV to zidovudine and the inhibition of HIV replication in man or clinical response to therapy has not been established. *In vitro* sensitivity results vary greatly depending upon the time between virus infection and zidovudine treatment, the particular assay used, the cell type employed, and the laboratory performing the test. In addition, the methods currently used to establish virologic responses in clinical trials may be relatively insensitive in detecting changes in the quantities of actively replicating HIV or reactivation of these viruses.

Zidovudine blocked 90% of detectable HIV replication *in vitro* at concentrations of ≤0.13 µg/ml (ID₉₀) when added shortly after laboratory infection of susceptible cells. This level of antiviral effect was observed in experiments measuring reverse transcriptase activity in H9 cells, PHA stimulated peripheral blood lymphocytes, and unstimulated peripheral blood lymphocytes. The concentration of drug required to produce a 50% decrease in supernatant reverse transcriptase was 0.013 µg/ml (ID₅₀) in both H9 cells and peripheral blood lymphocytes. Zidovudine at concentrations of 0.13 µg/ml also provided >90% protection from a strain of HIV (HTLV IIIB) induced cytopathic effects in two tetanus-specific T4 cell lines. p24 gag protein expression was also undetectable at the same concentration in these cells. Partial inhibition of viral activity in cells with chronic HIV infection (presumed to carry integrated HIV DNA) required concentrations of zidovudine (8.8 µg/ml in one laboratory to 13.3 µg/ml in another) which are approximately 100 times as high as those necessary to block HIV replication in acutely infected cells. Because a limited number of virus isolates have been tested for sensitivity to zidovudine, these results may not reflect the susceptibility of all HIV strains causing disease in the general population.

Although limited testing has demonstrated no HIV isolates resistant to zidovudine, the development of resistance to zidovudine has not been adequately studied and the frequency of zidovudine-resistant isolates existing in the general population is unknown.

The major metabolite of zidovudine, 3'-azido-3'-deoxy-5'-O-β-D-glucopyranuronosylthymidine (GAZT), does not inhibit HIV replication *in vitro*. GAZT does not antagonize the antiviral effect of zidovudine *in vitro* nor does GAZT compete with zidovudine triphosphate as an inhibitor of HIV reverse transcriptase.

The cytotoxicity of zidovudine for various cell lines was determined using a cell growth assay. ID₅₀ values for several human cell lines showed little growth inhibition by zidovudine except at concentrations >50 µg/ml. However, one human T-lymphocyte cell line was sensitive to the cytotoxic effect of zidovudine with an ID₅₀ of 5 µg/ml. Moreover, in a colony-forming unit assay designed to assess the toxicity of zidovudine for human bone marrow, an ID₅₀ value of <1.25 µg/ml was estimated. Two of ten human lymphocyte cultures tested were found to be sensitive to zidovudine at 5 µg/ml or less.

Zidovudine has antiviral activity against some mammalian retroviruses in addition to HIV. No significant inhibitory activity was exhibited against a variety of other human and animal viruses, except an ID₅₀ of 1.4 to 2.7 µg/ml against the Epstein-Barr virus, the clinical significance of which is not known at this time.

The following microbiological activities of zidovudine have been observed *in vitro* but the clinical significance is unknown. Many *Enterobacteriaceae*, including strains of *Shigella*, *Salmonella*, *Klebsiella*, *Enterobacter*, *Citrobacter*, and *Escherichia coli* are inhibited *in vitro* by low concentrations of zidovudine (0.005 to 0.5 µg/ml). Synergy of zidovudine with trimethoprim has been observed against some of these bacteria *in vitro*. Limited data suggest that bacterial resistance to zidovudine develops rapidly. Zidovudine has no activity against gram positive organisms, anaerobes, mycobacteria, or fungal pathogens including *Candida albicans* and *Cryptococcus neoformans*. Although *Giardia lamblia* is inhibited by 1.9 µg/ml of zidovudine, no activity was observed against other protozoal pathogens

Pharmacokinetics: The pharmacokinetics of zidovudine has been evaluated in 22 adult HIV-infected patients in a Phase I dose-escalation study. Cohorts of 3 to 7 patients received 1 hour intravenous infusions of an investigational formulation of zidovudine ranging from 1 to 2 5 mg/kg every 8 hours to 2 5 to 7.5 mg/kg every 4 hours (3 to 45 mg/kg/day) for 14 to 28 days followed by oral dosing ranging from 2 to 5 mg/kg every 8 hours to 5 to 10 mg/kg every 4 hours (6 to 60 mg/kg/day) for an additional 32 days. After oral dosing, zidovudine was rapidly absorbed from the gastrointestinal tract with peak serum concentrations occurring within 0 6 to 1.5 hours. Dose-independent kinetics was observed over the range of 2 mg/kg every 8 hours to 10 mg/kg every 4 hours. The mean zidovudine half-life was approximately 1 hour and ranged from 0.78 to 1.93 hours following oral dosing.

Steady-state serum concentrations of zidovudine following chronic oral administration of 250 mg every 4 hours (3 0 to 5 4 mg/kg) were determined in 21 patients (body weight ranged from 46.0 to 83.6 kg) in a Phase II trial. Mean steady-state predose and 1.5 hours postdose zidovudine concentrations were 0.16 µg/ml (range 0 to 0.84 µg/ml) and 0.62 µg/ml (range 0.05 to 1.46 µg/ml), respectively.

Zidovudine is rapidly metabolized to 3'-azido-3'-deoxy-5'-O-β-D-glucopyranuronosylthymidine (GAZT) which has an apparent elimination half-life of 1 hour (range 0.61 to 1.73 hours). Following oral administration, urinary recoveries of zidovudine and GAZT accounted for 14 and 74% of the dose, respectively, and the total urinary recovery averaged 90% (range 63 to 95%), indicating a high degree of absorption. However, as a result of first-pass metabolism, the average oral capsule bioavailability of zidovudine is 65% (range 52 to 75%).

Additional pharmacokinetic data following intravenous dosing indicated dose-independent kinetics over the range of 1 to 5 mg/kg with a mean zidovudine half-life of 1.1 hours (range 0 48 to 2 86 hours). Total body clearance averaged 1900 ml/min/70 kg and the apparent volume of distribution was 1 6 L/kg. Renal clearance is estimated to be 400 ml/min/70 kg, indicating glomerular filtration and active tubular secretion by the kidneys. Zidovudine plasma protein binding is 34 to 38%, indicating that drug interactions involving binding site displacement are not anticipated.

The zidovudine cerbrospinal fluid (CSF)/plasma concentration ratio measured 1 8 hours following oral dosing at 2 mg/kg was 0.15 (n=1). The ratios measured at 2 to 4 hours following intravenous dosing of 2 5 mg/kg and 5 0 mg/kg were 0 20 (n=1) and 0 64 (n=3), respectively.

**INDICATIONS AND USAGE**

Retrovir Capsules are indicated for the management of certain adult patients with symptomatic HIV infection (AIDS and advanced ARC) who have a history of cytologically confirmed *Pneumocystis carinii* pneumonia (PCP) or an absolute CD4 (T4 helper/inducer) lymphocyte count of less than 200/mm³ in the peripheral blood before therapy is begun. This indication is based primarily on the results of a randomized, double-blind, placebo-controlled trial conducted at 12

*Continued on next page*

### Burroughs Wellcome—Cont.

medical centers in the United States in which 281 patients with AIDS or advanced ARC were studied for an average of four and a half months Additional data have been collected on approximately 80% of these patients who have received zidovudine in an open-label extension of this trial for an average of five more months.

The patient population of the controlled trial consisted of 160 AIDS patients (85 Retrovir and 75 placebo) who had recovered from their first episode of PCP diagnosed within the previous four months and 121 ARC patients (59 Retrovir and 62 placebo) with multiple signs and symptoms of HIV infection, including mucocutaneous candidiasis and/or unexplained weight loss (≥ 15 lbs or > 10% of prior body weight). All patients had evidence of impaired cellular immunity with an absence of delayed cutaneous hypersensitivity and a decreased number of CD4 (T4) lymphocytes in the peripheral circulation. Two hundred twenty-one (79% of all patients) had fewer than 200 T4 cells/mm³ at entry (95% of AIDS patients and 67% of ARC patients). All patients began therapy at a dose of 250 mg every 4 hours around the clock. This dosage was reduced or temporarily or permanently discontinued if serious marrow toxicity occurred. The trial was stopped because of a significant reduction in mortality before all patients had completed the planned 24 weeks of treatment. There were 19 deaths in the placebo group and 1 in the Retrovir group (p <.001). All deaths were apparently due to opportunistic infections (OI) or other complications of HIV infection. Treatment duration ranged from 12 weeks to 26 weeks, with a mean and median duration of 17 and 18 weeks, respectively.

Retrovir also significantly reduced the risk of acquiring an AIDS-defining OI in patients after 6 weeks of treatment (p <.001). In addition, patients who received Retrovir generally did better than the placebo group in terms of several other measures of efficacy including performance level, neuropsychiatric function, maintenance of body weight and the number and severity of symptoms associated with HIV infection. A modest increase in mean CD4 (T4) counts was seen in the zidovudine group but the significance of this finding is unclear as the CD4 (T4) counts declined again in some patients.

The most significant adverse reaction noted in the study was a depression of formed elements in the peripheral blood, which necessitated dose reduction or drug discontinuation in 49 of the 144 (34%) patients receiving Retrovir. Of those participants whose baseline CD4 (T4) lymphocyte counts were less than 200, 47% of those receiving Retrovir and 10% of those receiving placebo developed a granulocyte count of <750/mm³. Similarly, 45% of Retrovir recipients and only 14% of placebo recipients had a > 25% reduction in hemoglobin. Transfusions were administered to some patients with anemia. 47 of 114 (41%) Retrovir recipients and 17 of 107 (16%) placebo recipients with <200 CD4 lymphocytes at entry were transfused. Only one of 30 Retrovir recipients and none of 30 placebo recipients with >200 CD4 lymphocytes required transfusion.

Although mean platelet counts in Retrovir recipients were statistically increased compared to mean baseline values, thrombocytopenia did occur in some patients Twelve percent (12%) of Retrovir recipients compared to 5% of placebo recipients had >50% decreases from baseline platelet count (see ADVERSE REACTIONS).

At the conclusion of the placebo-controlled trial, 127 Retrovir recipients and 100 placebo recipients elected to enroll in an uncontrolled extension protocol in which all patients received Retrovir at a dose of 200 mg every four hours. This dose was chosen because of concern about cumulative hematologic toxicity and to allow for greater flexibility in dosing. Over the subsequent five months, opportunistic infections continued to occur and additional patients died in both groups. Sixteen patients from the original placebo cohort died after the conclusion of the controlled trial. Four of these 16 never received Retrovir and seven expired during the first month of therapy. Ten additional deaths occurred among the original Retrovir recipients. With respect to these data, termination of the controlled trial precludes direct comparisons of mortality and morbidity between the original placebo and drug recipients Long-term follow-up of these patients, however, will allow for examination of the natural history of prolonged zidovudine therapy.

### CONTRAINDICATIONS

Retrovir Capsules are contraindicated for patients who have potentially life-threatening allergic reactions to any of the components of the formulation.

### WARNINGS

Zidovudine has been carefully studied in limited numbers of seriously ill HIV-infected patients treated for a limited period of time. Therefore, the full safety and efficacy profile of zidovudine has not been completely defined, particularly in regard to prolonged use, and especially in HIV-infected individuals who have less advanced disease.

Zidovudine should be used with extreme caution in patients who have bone marrow compromise evidenced by granulocyte count <1000/mm³ or hemoglobin <9 5 g/dl. In the placebo-controlled study, anemia and granulocytopenia were the most significant adverse events observed (see ADVERSE REACTIONS). There have been reports of pancytopenia associated with the use of zidovudine, which was reversible in most instances after discontinuance ot the drug. Significant anemia most commonly occurred after 4 to 6 weeks of therapy and in many cases required dose adjustment, discontinuation of zidovudine, and/or blood transfusions. Frequent (at least every 2 weeks) blood counts are strongly recommended in patients taking zidovudine If anemia or granulocytopenia develops, dosage adjustments may be necessary (see DOSAGE AND ADMINISTRATION).

Coadministration of zidovudine with other drugs metabolized by glucuronidation should be avoided because the toxicity of either drug may be potentiated (see Drug Interactions under PRECAUTIONS). Zidovudine recipients who used acetaminophen during the controlled trial had an increased incidence of granulocytopenia which appeared to be correlated with the duration of acetaminophen use.

### PRECAUTIONS

**General:** Zidovudine is eliminated from the body primarily by renal excretion following metabolism in the liver (glucuronidation) There are currently no data available concerning the use of zidovudine in patients with impaired renal or hepatic function, and such patients may be at a greater risk of toxicity from zidovudine.

**Information for Patients:** Zidovudine is not a cure for HIV infections, and patients may continue to acquire illnesses associated with AIDS or ARC, including opportunistic infections. Therefore, patients should be advised to seek medical care for any significant change in their health status.

Patients should be informed that the major toxicities of zidovudine are granulocytopenia and/or anemia They should be told that they may require transfusions or dose modifications including possible discontinuation if toxicity develops. They should be told of the extreme importance of having their blood counts followed closely while on therapy. They should be cautioned about the use of other medications such as acetaminophen that may exacerbate the toxicity of zidovudine.

Retrovir Capsules are for oral ingestion only. Patients should be told of the importance of taking zidovudine exactly as prescribed, and that administration every 4 hours includes dosing around the clock, even though it may interrupt their normal sleep They should be told not to share medication and not to exceed the recommended dose. They should be told that the long-term effects of zidovudine are unknown at this time

Patients should be advised that zidovudine therapy has not been shown to reduce the risk of transmission of HIV to others through sexual contact or blood contamination.

**Drug Interactions:** The interaction of other drugs with zidovudine has not been studied in a systematic manner. Coadministration of zidovudine with drugs that are nephrotoxic, cytotoxic, or which interfere with RBC/WBC number or function (e g , dapsone, pentamidine, amphotericin B, flucytosine, vincristine, vinblastine, adriamycin, or interferon) may increase the risk of toxicity. Limited data suggest that probenecid may inhibit glucuronidation and/or reduce renal excretion of zidovudine. In addition, other drugs (e g , acetaminophen, aspirin, or indomethacin) may competitively inhibit glucuronidation (see WARNINGS).

Some experimental nucleoside analogues which are being evaluated in AIDS and ARC patients may affect RBC/WBC number or function and may increase the potential for hematologic toxicity of zidovudine. Some experimental nucleoside analogues affecting DNA replication antagonize the in vitro antiviral activity of zidovudine against HIV and thus, concomitant use of such drugs should be avoided.

Some drugs such as trimethoprim-sulfamethoxazole, pyrimethamine, and acyclovir may be necessary for the management or prevention of opportunistic infections. In the controlled trial, increased toxicity was not detected with limited exposure to these drugs However, there is one published report of neurotoxicity (profound lethargy) associated with concomitant use of zidovudine and acyclovir.

**Carcinogenesis, Mutagenesis, Impairment of Fertility:** Long-term carcinogenicity studies of zidovudine in animals have not been completed. However, in an in vitro mammalian cell transformation assay, zidovudine was positive at concentrations of 0 5 μg/ml and higher.

No evidence of mutagenicity (with or without metabolic activation) was observed in the Ames Salmonella mutagenicity assay. In a mutagenicity assay conducted in L5178Y/TK⁺/⁻ mouse lymphoma cells, zidovudine was weakly mutagenic in the absence of metabolic activation only at the highest concentrations tested (4000 and 5000 μg/ml) In the presence of metabolic activation, the drug was weakly mutagenic at concentrations of 1000 μg/ml and higher. In an in vitro cytogenetic study performed in cultured human lymphocytes, zidovudine induced dose-related structural chromosomal abnormalities at concentrations of 3 μg/ml and higher. No such effects were noted at the two lowest concentrations tested, 0 3 and 1 μg/ml. In an in vivo cytogenetic study in rats given a single intravenous injection of zidovudine at doses of 37.5 to 300 mg/kg, there were no treatment-related structural or numerical chromosomal alterations in spite of plasma levels that were as high as 453 μg/ml five minutes after dosing.

Effects of zidovudine on fertility have not been studied.

**Pregnancy:** Pregnancy Category C. An oral teratology study in pregnant rats using doses up to 20 times the human dose has revealed no evidence of harm to the fetus due to zidovudine. Other teratology and reproduction/fertility tests in animals have not been completed. It is not known whether zidovudine can cause fetal harm when administered to a pregnant woman or can affect reproductive capacity. Zidovudine should be given to a pregnant woman only if clearly needed

**Nursing Mothers:** It is not known whether zidovudine is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions from zidovudine in nursing infants, mothers should be instructed to discontinue nursing if they are receiving zidovudine

**Pediatric Use:** Safety and effectiveness in children have not been established

### ADVERSE REACTIONS

The most frequent adverse events and abnormal laboratory values reported in the placebo-controlled clinical trial of oral zidovudine administration in 281 patients (144 patients zidovudine; 137 patients placebo) were granulocytopenia and anemia The occurrence of these hematologic toxicities was inversely related to CD4 (T4) lymphocyte number, hemoglobin, and granulocyte count at study entry, and directly related to dose and duration of therapy. The frequency of granulocytopenia and anemia according to the patients' CD4 (T4) levels is shown in the following table:

[See table below left]

Because many patients were anemic and/or granulocytopenic before starting therapy with zidovudine, examining the degree of change when compared to baseline, as shown in the table below, may be more informative.

[See table on top next page]

The anemia appeared to be the result of impaired erythrocyte maturation as evidenced by increasing macrocytosis (MCV) while on drug.

The 281 patients treated in this controlled trial had serious underlying disease with multiple baseline symptoms and clinical abnormalities. The following table summarizes those reported clinical adverse events which occurred in at least 5% of all patients treated with zidovudine. Severe headache, nausea, insomnia and myalgia were reported at a significantly greater rate in zidovudine recipients.

[See table on bottom next page]

Clinical adverse events which occurred in less than 5% of all patients treated with zidovudine are listed below. Since many of these adverse events were seen in placebo-treated patients as well as zidovudine recipients, they may not be attributable to the drug.

*Body as a whole:* body odor, chills, edema of the lip, flu syndrome, hyperalgesia, back pain, chest pain, lymphadenopathy.

*Cardiovascular:* vasodilation.

*Gastrointestinal:* constipation, dysphagia, edema of the tongue, eructation, flatulence, bleeding gums, rectal hemorrhage, mouth ulcer.

*Musculoskeletal:* arthralgia, muscle spasm, tremor, twitch.

### Pretreatment CD4 (T4) Levels

| Abnormality | ≤ 200/mm³ | | > 200/mm³ | |
| --- | --- | --- | --- | --- |
| | Zidovudine (n = 113) | Placebo (n = 105) | Zidovudine (n = 30) | Placebo (n = 30) |
| Granulocytopenia (<750/mm³) | 47% | 10% | 10% | 3% |
| Anemia (Hgb <7 5 g/dl) | 30% | 6% | 3% | 0% |

| Abnormality | % Decrease from Baseline | ≤200/mm³ | | >200/mm³ | |
| --- | --- | --- | --- | --- | --- |
| | | Zidovudine (n=113) | Placebo (n=105) | Zidovudine (n=30) | Placebo (n=30) |
| Granulocytopenia | >50% | 55% | 19% | 40% | 13% |
| Anemia | >25% | 45% | 14% | 10% | 10% |

*Nervous:* anxiety, confusion, depression, emotional lability, nervousness, syncope, loss of mental acuity, vertigo.
*Respiratory:* cough, epistaxis, pharyngitis, rhinitis, sinusitis, hoarseness.
*Skin:* acne, pruritus, urticaria.
*Special senses:* amblyopia, hearing loss, photophobia.
*Urogenital:* dysuria, polyuria, urinary frequency, urinary hesitancy.
There have been reports of seizures associated with the use of zidovudine, particularly in patients with more advanced disease.

### OVERDOSAGE

One patient who ingested 10 to 20 grams (~110 to 220 mg/kg) of zidovudine as part of an intentional multidrug overdose (which also included triazolam and barbiturates) experienced mild ataxia acutely but exhibited no hematologic abnormalities on extended follow-up. If overdosage occurs, intensive observation for marrow suppression with transfusions and protective measures for granulocytopenia may be needed until marrow function returns. Although other nucleoside analogues have been partially removed by peritoneal dialysis or hemodialysis, it is not known whether zidovudine can be removed in this manner.

### DOSAGE AND ADMINISTRATION

The recommended starting dose of Retrovir is 200 mg (two 100 mg capsules) administered orally every four hours around the clock. In a 70 kg patient this dose corresponds to 2.9 mg/kg every four hours. The dose administered in the placebo-controlled clinical trial was 250 mg (2.3 to 5.9 mg/kg depending on body weight) every four hours (see INDICATIONS AND USAGE).
Hematologic toxicities appear to be related to pretreatment bone marrow reserve and to dose and duration of therapy. Careful monitoring of hematologic indices every two weeks is recommended to detect serious anemia or granulocytopenia. In patients with hematologic toxicity, reduction in hemoglobin may occur as early as 2 to 4 weeks, and granulocytopenia usually occurs after 6 to 8 weeks.
*Dose Adjustment:* Significant anemia (hemoglobin of <7.5 g/dl or reduction of >25% of baseline) and/or significant granulocytopenia (granulocyte count of <750/mm³ or reduction of >50% from baseline) may require a dose interruption until some evidence of marrow recovery is observed. For less severe anemia or granulocytopenia, a reduction in daily dose may be adequate. In patients who develop significant anemia, dose modification does not necessarily eliminate the need for transfusion. If marrow recovery occurs following dose modification, gradual increases in dose may be appropriate depending on hematologic indices and patient tolerance.

### HOW SUPPLIED

Retrovir Capsules 100 mg (white, opaque cap and body with a dark blue band) containing 100 mg zidovudine and printed with "Wellcome" and unicorn logo on cap and "Y9C" and "100" on body. Bottles of 100 (NDC 0081-0108-55).
Store at 15° to 25°C (59° to 77°F) and protect from light.
U.S. Patent No. 4724232 (Use Patent) Other Pats Pending
*Shown in Product Identification Section, page 407*

### SEPTRA® I.V. INFUSION ℞
[sĕp 'trah ]
(Trimethoprim and Sulfamethoxazole)

#### DESCRIPTION

Septra I.V. Infusion (Trimethoprim and Sulfamethoxazole), a sterile solution for intravenous infusion only, is a synthetic antibacterial combination product. Each ml contains 16 mg trimethoprim* and 80 mg sulfamethoxazole compounded with 40% propylene glycol, 10% ethyl alcohol and 0.3% diethanolamine; 1% benzyl alcohol and 0.1% sodium metabisulfite added as preservatives, water for injection, and pH adjusted to approximately 10 with sodium hydroxide.
Trimethoprim is 2,4-diamino-5-(3,4,5-trimethoxybenzyl)-pyrimidine It is a white to light yellow, odorless, bitter compound with a molecular weight of 290.3 and the molecular formula $C_{14}H_{18}N_4O_3$.
Sulfamethoxazole is $N^1$-(5-methyl-3-isoxazolyl)sulfanilamide. It is an almost white, odorless, tasteless compound with a molecular weight of 253.28 and the molecular formula $C_{10}H_{11}N_3O_3S$.

#### CLINICAL PHARMACOLOGY

Following a one-hour intravenous infusion of a single dose of 160 mg trimethoprim and 800 mg sulfamethoxazole to 11 patients whose weight ranged from 105 lbs. to 165 lbs. (mean, 143 lbs.), the mean peak plasma concentrations of trimethoprim and sulfamethoxazole were 3.4 ± 0.3 µg/ml and 46.3 ± 2.7 µg/ml, respectively. Following repeated intravenous administration of the same dose at eight-hour intervals, the mean plasma concentrations just prior to and immediately after each infusion at steady state were 5.6 ± 0.6 µg/ml and 8.8 ± 0.9 µg/ml for trimethoprim and 70.6 ± 7.3 µg/ml and 105 6 ± 10.9 µg/ml for sulfamethoxazole. The mean plasma half-life was 11.3 ± 0.7 hours for trimethoprim and 12.8 ± 1.8 hours for sulfamethoxazole All of these 11 patients had normal renal function and their ages ranged from 17 to 78 years (median, 60 years)[1].
Pharmacokinetic studies in children and adults suggest an age-dependent half-life of trimethoprim as indicated in the following table.[2]

| Age (yrs.) | No. of Patients | Mean TMP Half-life (hours) |
| --- | --- | --- |
| <1 | 2 | 7.67 |
| 1–10 | 9 | 5.49 |
| 10–20 | 5 | 8.19 |
| 20–63 | 6 | 12.82 |

Patients with severely impaired renal function exhibit an increase in the half-lives of both components, requiring dosage regimen adjustment (see DOSAGE AND ADMINISTRATION section).
Both trimethoprim and sulfamethoxazole exist in the blood as unbound, protein-bound and metabolized forms; sulfamethoxazole also exists as the conjugated form. The metabolism of sulfamethoxazole occurs predominantly by $N_4$-acetylation, although the glucuronide conjugate has been identified. The principal metabolites of trimethoprim are the 1- and 3- oxides and the 3'- and 4'-hydroxy derivatives. The free forms of trimethoprim and sulfamethoxazole are considered to be the therapeutically active forms Approximately 44% of trimethoprim and 70% of sulfamethoxazole are bound to

plasma proteins. The presence of 10 mg percent sulfamethoxazole in plasma decreases the protein binding of trimethoprim by an insignificant degree; trimethoprim does not influence the protein binding of sulfamethoxazole.
Excretion of trimethoprim and sulfamethoxazole is primarily by the kidneys through both glomerular filtration and tubular secretion. Urine concentrations of both trimethoprim and sulfamethoxazole are considerably higher than are the concentrations in the blood. The percent of dose excreted in urine over a 12-hour period following the intravenous administration of the first dose of 240 mg of trimethoprim and 1200 mg of sulfamethoxazole on day 1 ranged from 17% to 42.4% as free trimethoprim; 7% to 12.7% as free sulfamethoxazole; and 36.7% to 56% as total (free plus the $N_4$-acetylated metabolite) sulfamethoxazole. When administered together as Septra, neither trimethoprim nor sulfamethoxazole affects the urinary excretion pattern of the other. Both trimethoprim and sulfamethoxazole distribute to sputum and vaginal fluid; trimethoprim also distributes to bronchial secretions and both pass the placental barrier and are excreted in human milk.
*Microbiology:* Sulfamethoxazole inhibits bacterial synthesis of dihydrofolic acid by competing with para-aminobenzoic acid (PABA). Trimethoprim blocks the production of tetrahydrofolic acid from dihydrofolic acid by binding to and reversibly inhibiting the required enzyme, dihydrofolate reductase. Thus, Septra blocks two consecutive steps in the biosynthesis of nucleic acids and proteins essential to many bacteria.
*In vitro* studies have shown that bacterial resistance develops more slowly with Septra than with trimethoprim or sulfamethoxazole alone.
*In vitro* serial dilution tests have shown that the spectrum of antibacterial activity of Septra includes common bacterial pathogens with the exception of *Pseudomonas aeruginosa*. The following organisms are usually susceptible: *Escherichia coli, Klebsiella species, Enterobacter species, Morganella morganii, Proteus mirabilis,* indole-positive *Proteus species,* including *Proteus vulgaris, Haemophilus influenzae* (including ampicillin-resistant strains), *Streptococcus pneumoniae, Shigella flexneri* and *Shigella sonnei.* It should be noted, however, that there are little clinical data on the use of Septra I.V. Infusion in serious systemic infections due to *Haemophilus influenzae* and *Streptococcus pneumoniae.*
[See table on next page].
*Susceptibility Testing:* The recommended quantitative disc susceptibility method may be used for estimating the susceptibility of bacteria to Septra.[3,4] With this procedure, a report from the laboratory of "Susceptible to trimethoprim and sulfamethoxazole" indicates that the infection is likely to respond to therapy with Septra. If the infection is confined to the urine, a report of "Intermediate susceptibility to trimethoprim and sulfamethoxazole" also indicates that the infection is likely to respond. A report of "Resistant to trimethoprim and sulfamethoxazole" indicates that the infection is unlikely to respond to therapy with Septra.

#### INDICATIONS AND USAGE

*PNEUMOCYSTIS CARINII PNEUMONIA:* Septra I.V. Infusion is indicated in the treatment of *Pneumocystis carinii* pneumonia in children and adults.
*SHIGELLOSIS:* Septra I.V. Infusion is indicated in the treatment of enteritis caused by susceptible strains of *Shigella flexneri* and *Shigella sonnei* in children and adults.
*URINARY TRACT INFECTIONS:* Septra I.V. Infusion is indicated in the treatment of severe or complicated urinary tract infections due to susceptible strains of *Escherichia coli, Klebsiella species, Enterobacter species, Morganella morganii,* and *Proteus species* when oral administration of Septra is not feasible and when the organism is not susceptible to single agent antibacterials effective in the urinary tract.
Although appropriate culture and susceptibility studies should be performed, therapy may be started while awaiting the results of these studies.

#### CONTRAINDICATIONS

Hypersensitivity to trimethoprim or sulfonamides. Patients with documented megaloblastic anemia due to folate deficiency. Pregnancy at term and during the nursing period, because sulfonamides pass the placenta and are excreted in the milk and may cause kernicterus Infants less than two months of age.

#### WARNINGS

**FATALITIES ASSOCIATED WITH THE ADMINISTRATION OF SULFONAMIDES, ALTHOUGH RARE, HAVE OCCURRED DUE TO SEVERE REACTIONS, INCLUDING STEVENS-JOHNSON SYNDROME, TOXIC EPIDERMAL NECROLYSIS, FULMINANT HEPATIC NECROSIS, AGRANULOCYTOSIS, APLASTIC ANEMIA AND OTHER BLOOD DYSCRASIAS.
SEPTRA SHOULD BE DISCONTINUED AT THE FIRST APPEARANCE OF SKIN RASH OR ANY SIGN OF ADVERSE REACTION.** Clinical signs, such as rash, sore throat, fever, arthralgia, cough, shortness of breath, pallor, purpura or

*Continued on next page*

| | Zidovudine (n=144) % | Placebo (n=137) % | | Zidovudine (n=144) % | Placebo (n=137) % |
| --- | --- | --- | --- | --- | --- |
| Adverse Event | | | Adverse Event | | |
| **BODY AS A WHOLE** | | | **MUSCULOSKELETAL** | | |
| Asthenia | 19 | 18 | Myalgia | 8 | 2 |
| Diaphoresis | 5 | 4 | **NERVOUS** | | |
| Fever | 16 | 12 | Dizziness | 6 | 4 |
| Headache | 42 | 37 | Insomnia | 5 | 1 |
| Malaise | 8 | 7 | Paresthesia | 6 | 3 |
| **GASTROINTESTINAL** | | | Somnolence | 8 | 9 |
| Anorexia | 11 | 8 | **RESPIRATORY** | | |
| Diarrhea | 12 | 18 | Dyspnea | 5 | 3 |
| Dyspepsia | 5 | 4 | **SKIN** | | |
| GI Pain | 20 | 19 | Rash | 17 | 15 |
| Nausea | 46 | 18 | **SPECIAL SENSES** | | |
| Vomiting | 6 | 3 | Taste Perversion | 5 | 8 |

Percentage (%) of Patients with Clinical Events

---

ATTACHMENT D

Georgia Department of Human
Resources

878 Peachtree Street, N.E.
Atlanta, Georgia 30309

June 27, 1989

The Honorable Charles A. Moye
2342 United States Courthouse
75 Spring Street
Atlanta, Georgia 30303

Dear Judge Moye:

The use of AZT in treating HIV infection is constantly being updated as experience grows. At the recent 5th International Conference on AIDS & HIV Infection, in Montreal, several scientific papers reported that the earlier AZT was started for treatment of HIV patients with T4 cell counts of 200/ml or less, the greater the reduction in

mortality, especially in the first two (2) years after treatment was begun. Also, several promising new drugs, close relatives of AZT chemically, are being studied and should be available in six to twelve months.

If I may provide you with any further information, please contact me.

Sincerely,
 (s) Joseph A. Wilber
 Joseph A. Wilber, M.D.
 Medical Consultant
 Office of Infectious Disease

---

## ATTACHMENT E

## 10 TREATMENT OF HIV–RELATED IMMUNODEFICIENCY

Many drugs are being investigated for their ability to prevent HIV replication and restore immune function, but many problems must be overcome before effective therapy is achieved. Viral eradication is difficult because HIV genetic material is integrated into the host chromosomal DNA. In addition, HIV infects cells of the central nervous system, providing a reservoir of continued infection if antiviral agents do not cross the blood-brain barrier.

### Zidovudine ("AZT," Retrovir®)

Only one antiviral agent has been clearly shown to improve immune function in AIDS patients. Zidovudine is a competitive inhibitor of reverse transcriptase, the enzyme that copies the viral RNA molecule into DNA. This inhibition prevents viral replication and protects the infected cell. A preliminary study in 1985 showed that the drug may be of benefit: 17 of 25 patients on Zidovudine had increases in the number of T-helper lymphocytes, and six of 16 patients who were anergic at entry developed positive skin tests.[46] Subsequent to this, a randomized, placebo-controlled trial of Zidovudine therapy was begun in 280 patients with either a successfully treated episode of *P. carinii* pneumonia or a history of AIDS–Related Complex.[47] The trial began in February, 1986. By September, 1986, 19 deaths had occurred in the placebo group and one death in the Zidovudine group. In addition to the difference in mortality rates, patients in the Zidovudine group showed several clinical and immunologic improvements, including a reduction in the number of opportunistic infections. In another clinical trial, Zidovudine treatment was associated with significant neurologic improvement in patients with AIDS Dementia Complex or peripheral neuropathy.[48]

Zidovudine causes significant toxicity in some patients. Macrocytic anemia was the most commonly observed toxic effect in the previously mentioned study, necessitating transfusion in 25% of patients. Preliminary data suggest that patients with more advanced cases of AIDS are more likely to experience severe anemia and neutropenia after long-term treatment with Zidovudine.[49] A newly recognized long-term toxic effect, presented at the Fourth International AIDS Conference at Stockholm, Sweden, in June, 1988, was a syndrome of myalgias associated with an elevation of the CPK.

Whether Zidovudine will be effective for all patients with AIDS is unknown. Burroughs Wellcome and the National Institutes of Health are now conducting studies of Zidovudine in pediatric AIDS patients, adults with Kaposi's sarcoma, and asymptomatic persons with HIV infection. It is clear that Zidovudine is not a cure for AIDS and may cause serious side effects. Its use should be limited to physicians who routinely treat patients with AIDS.

There is no other effective anti-viral agent available. Several other modalities of treatment are currently under investigation, and many other modalities are being pursued by the "underground."

It is hoped that clinical research on all agents will be rapid and productive. Some of this research may necessarily come from

community research initiatives. These should be carefully developed and conducted.

---

## ATTACHMENT F

Georgia Department of Human Resources

878 Peachtree Street, N.E.
Atlanta, Georgia 30309

July 3, 1989

The Honorable Charles A. Moye
2342 United States District Court House
75 Spring Street
Atlanta, Georgia 30303

Dear Judge Moye:

In response to the question: "Can a patient have symptomatic Human Immunodeficiency Virus (HIV) infection and not have Acquired Immune Deficiency Syndrome (AIDS)?" The answer is yes. AIDS is a carefully defined *end stage* in the spectrum of disease produced by HIV used mainly for epidemologic and public health purposes. Certain indicator infectious diseases (eg. Pneumocystis Carinii pneumonia, Cryptococcal menigitis, Toxoplasma Gondii encephelitis or certain indicator malignancies (Kaposi's sarcoma, Primary brain lymphoma) are required to make the diagnosis of AIDS.

Many patients with HIV are symptomatic (i.e. ill) for months or years before the criteria for AIDS are met. Other non-specific symptomatic illnesses occur commonly in patients with HIV infection, (eg. recurrent herpes genitalia, oral candida infections, many different skin disorders, nonspecific fevers, diarrhea and weight loss) but are not diagnostic of AIDS and are also seen in patients without HIV infection.

Sincerely,

(s) Joseph A. Wilber
Joseph A. Wilber, M.D.
Medical Consultant
Office of Infectious Disease
AIDS Program

---

## ATTACHMENT G

In the United States District Court

for the Northern District of Georgia

Atlanta Division

Robert Bruce Hawley, Plaintiff,

v.

David C. Evans, et al., Defendants.

Civil Action No. 1:88–CV–2185–CAM.

### SUPPLEMENT TO CROSS–MOTION FOR SUMMARY JUDGMENT

Comes now before me the undersigned officer duly authorized to administer oaths, L. Newton Turk, M.D., who, after being duly sworn states as follows:

1.

My name is L. Newton Turk, M.D. and I am the Medical Director for the Georgia Department of Corrections. I am over the age of majority and competent to testify in this matter.

2.

Consistent with the Physician's Desk Reference and directives from manufacturer (Burroughs Wellcome), AZT is offered to anyone who is symptomatic HIV infected and whose T–Lymphocytes are 200 or below. This will include the ARC's or all the AIDS. We would not offer this to everyone whose T–Lymphocytes are below 200 but only to those who have had symptoms and have fallen into the category known as ARC and AIDS.

3.

Those patients who have the HIV virus but have no symptomatic HIV infection will not be offered AZT. For example, if a patient has the HIV virus but shows no signs of illness or shows only minor signs of illness such as night sweats or a body rash, AZT will not be offered to that patient.

4.

This is a general statement concerning the policy of administration of AZT and certain other complicating factors, such as pregnancy or a pre-existing serious disease, may alter the above.

Further, affiant sayeth not. This the 5th Day of July, 1989.

(s) L. Newton Turk M.D.
L. Newton Turk, M.D.

Sworn to and subscribed before me this 5th Day of July, 1989.

(s) [Signature]
Notary Public